**IN THE UNITED STATES DISTRICT COURT**
**FOR DISTRICT OF COLORADO**

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
NOV 19 2012
JEFFREY P. COLWELL
CLERK

Civil Action No. 11-cv-03238-PAB-KMT

**Samuel M Walker, pro se**
**Diane H Walker, pro se**

**Plaintiffs,**

**v.**

**Fred Wagener, individual and official capacity**
**Bobby Priestly, individual and official capacity**
**Cindy Hardy, individual and official capacity**
**Rebecca Bramlett, individual and official capacity**
**Amy Franck, individual and official capacity**
**Juan Gallegos, individual and official capacity**
**Dep Sgt Brown, individual and official capacity**
**Park County**
**Park County Commissioners**
**Attorney General, Colorado, official capacity**
**Park County Court Clerk**

**Defendants**

**PLAINTIFFS' ANSWER TO DEFENDANTS MOTION FOR SUMMARY JUDGEMENT**

Plaintiffs, Samuel M Walker and Diane H Walker, pro se Plaintiffs, hereby submit their Answer to Defendants Motion for Summary Judgement, and in support thereof state as follows:

## I Introduction

The issue presented before the Court is whether Defendants are entitled to qualified immunity when they willfully and wantonly exceeded the scope of the lawfully issued search warrant, thus violation Plaintiffs' Fourth Amendment rights and claims for relief.

## II Standard of Review

Pursuant to the Court's directive, parties are proceeding under Fed.R.Civ.P.56.

## III. Statement of Material Undisputed Facts

1. The search warrant executed in January, 2010 was very specific and with particularity, "…search for : Six deceased dogs… and sent for Necropsy." (Defendants Exhibit A at paragraph 2).
2. Contrary to Defendants statement regarding a "detached Magistrate (a…County Court Judge)", the warrant was issued be a District Judge (Defendants Exhibit A).
3. Defendants Exhibit C makes clear that Sgt Priestly knew (not suspected) that six dead huskies were on the **surface** of the "pit". "I counted a total of seven deceased dogs in a ravine… One of these dogs was removed on December 16, 2009…". "I did not remove the remaining six deceased Husky dogs at the time…". (last paragraph on page 1 of Defendant's Exhibit C).
4. Sgt Priestly and others used a backhoe to desecrate the animal graveyard.
5. Sgt Priestly and others retrieved four deceased dogs (defendants para 14-16).
6. Officer Bramlett noted in her affidavit, four dogs were retrieved on the surface with shovels (Plaintiffs' (P) Exhibit A).
7. Sgt Priestly and others proceeded to dig up the entire graveyard counting out 35 deceased dogs and one cat. (P-Exhibit A).
8. There were a total of four euthanized dogs dug up and their bags opened to expose the bio-hazard to the environment. ~~(P-Exhibit ___)~~ SW
9. Defendants did not stop at dead dog number six as specified on the search warrant.
10. Defendants exceeded the scope of the lawfully issued search warrant when they

continued to dig up the entire grave yard at dead dog number seven.

11. Defendants knew the grave yard contained euthanized animals (P-Exhibit B & C).

12. Euthanized animals must be buried at least two feet below the surface (P-Exhibit D).

13. Dr James Wright, owner of the Animal Care Clinic in Park County, seals the euthanized animal in a thick plastic bag (either blue or black). (EXHIBIT E)

14. Each dead dog buried in a sealed plastic bag was opened by defendants.

15. Plastic bags are exposed to the environment as of this writing (NOW).

16. A blue plastic bag exposed to the environment has been accessed by local wildlife (P-Exhibit F & F1-F3).

17. Many dog remains are strewn on the surface of the graveyard today.

18. Defendants did not re-bury any deceased dog a minimum of 2 feet after the desecration of the graveyard.

19. Defendants interviewed witnesses who stated 20-30 dogs dies yearly (estimate 100+ dead dogs in the graveyard) (Exhibit G).

20. Exposing euthanized dogs on or near the surface of the graveyard created a Bio-hazard which violates the following Federal Statutes: (1) Migratory Bird Treaty Act: 16USC§703-712 ch 128; (2) Eagle Protection Act: 16USC§668; (3) Endangered Species Act: 16USC§1531-1544. (Exhibit D).

21.

## IV Argument

**A.** Qualified Immunity Standards defined in Defendants Motion.

**B. The Law Enforcement Officers are NOT entitled to Qualified Immunity because they DID NOT comply with U S Supreme Court, Tenth Circuit, and weight of other court precedents regarding the execution of a warrant.**

Contrary to Defense counsel extensive research back to St James (1607), California gold (1859) and Colorado gold (1896), the warrant only specified and required Defendants to search and seize 6 deceased dogs (same dogs referenced above) that these officers physically and personally observed in the "pit" on the surface (the animal graveyard) during the December 15-17, 2009 Raid.

But no, these Defendants ordered a backhoe from Road and Bridge to "carefully dig up the entire graveyard". The Defendants knew they were in the pit on the surface. Search and seize six dead dogs and go back home. Very simple and very exact.

Reasonableness is mandated by the Fourth Amendment. *(Duncan v Barnes, 592 F.2d 1336, 1338 (5thCir 1977)).* Reasonableness defined by Black's Law Dictionary, 8th Ed, is Fair, proper, or moderate. Determining the reasonableness of any search involves a determination of whether the search was justified at its inception and whether as conducted, it was reasonably related in scope to the circumstances that justified the interference in the first place. *(New Jersey v TLO, 469 US 325, 341, 337-343 (1985).* Conducting a "witch hunt" by digging up every dead dog in the animal graveyard was not remotely reasonable. It was not moderate, it was extreme.

The Scope of the Warrant was grossly exceeded. "A warrant authorizes a search only in a manner which is necessary to find those items specified in the warrant." *(State v Hawkins,*

*255 Or.39 (1970), State v Sagner, 12 Or.App. 459 (1973)).* Search and seize 6 dead dogs. "The law enforcement officers executing the search warrant evidenced such a flagrant disregard for the terms of the warrant that the otherwise valid search warrant was converted into an invalid general warrant." (State v Johnson, 607 So.2d 545 (Fla. 2nd DCA 1992)). "Under the Fourth Amendment, a search warrant must describe the items to be seized with sufficient particularity to prevent a "general exploratory rummaging in a person's belongings". *(Coolidge v New Hampshire, 403 US 443, 467, 91 S.Ct 2022, 2038, 29 L.Ed2d 564 (1971)).* Finally, "when law enforcement officers "grossly exceed" the scope of a search warrant, suppression of all evidence seized under the warrant is required." (*US v Medlin, 842 F.2d 1194, 1199 (10th Cir 1988).*

Applying "totality of circumstances" doctrine does not apply to the execution of a search warrant. "Totality of circumstances" defined by Black's Law Dictionary, as a standard for determining whether hearsay is sufficiently reliable to establish probable cause for an arrest or search warrant." It is applied as a standard to establish probable cause. *(Illinois v Gates, 462 US 213, 103 S.Ct 2317 (1983)).* Using the "totality of circumstances does not support the execution of the search warrant nor the concept of "end justifies the means".

## CONCLUSION

Defendants were unreasonable during the execution of the search warrant.

Defendants grossly exceeded the scope of the search warrant.

Defendant's flagrant disregard for the terms of the search warrant was willful and wanton.

Defendant's willfull and wanton conduct caused a bio-hazard that still exists today and is a direct violation of existing Federal environmental laws.

As a Private Attorney General, I'm requesting the court to refer these specific Federal violations to the Federal Dept of Justice or to the local Federal Marshall's office for prosecution.

Respectfully submitted,

Samuel M Walker
POB 14085
Colorado Springs, CO 80914
703-674-8890 (c)
elksky@gmail.com

Diane H Walker
POB 59
Florissant, CO 80816
719-330-7325 (cell)
reddog0918@yahoo.com

**CERTIFICATE OF SERVICE**

This is to certify that I have duly served the Answer to Defendants Motion for Summary Judgement upon all parties or representing attorneys herein by depositing of same in the United States mail, first-class postage prepaid, at Colorado Springs, Colorado, this 16th day of November 2012 addressed as follows:

Samuel M Walker
Name:
Address:

Fowler, Schimberg & Flanagan, PC
1640 Grant Street, Suite 150
Denver, CO 80203

US District Court
901 19th St, Rm A-105
Denver, CO 80294-3589

AFFIDAVIT OF SAMUEL M WALKER

1. I am over eighteen years of age and have personal knowledge of the matters stated herein.
2. All referenced Discovery from 09CR090, identified in Plaintiffs' exhibits was provided to me by my attorney Pamela Mackey on electronic disk. I understood that the information was compiled by Park County officials, presented to the DDA Ms O'Brien who then mailed it to Ms Mackey.
3. Copies of selected pages from written reports or excerpts from audio interviews are included in Plaintiffs' exhibits.

Samuel M Walker

Samuel M Walker

Subscribed and sworn to before me on Nov 16, 2012

Notary Public: Christine Race

My Commission expires: 3/18/2016

CHRISTINE E. RACE
NOTARY PUBLIC, STATE OF COLORADO
My Comm. Expires March 18, 2016
20044005456

EXHIBIT A

**PARK COUNTY SHERIFF'S OFFICE**
CONTINUATION SHEET

| Initial Offense Classification | Subject | Case Report Number / Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Samuel and Diane Walker** | **2009001744** / **1/13/10** |

On January 12, 2010, at approximately 5:00 PM, I received a call at my residence from Sergeant B. Priestly who stated that she had completed a second search warrant for the Walker's dog sled compound at 6000 Forest Service Road 108, Hartsel, Park County, Colorado. She stated that we would be going there first thing tomorrow morning to dig up the area known as the "pit" that allegedly contained multiple deceased dogs.

On January 13, 2010, at approximately 7:30 AM, I met with Sergeant B. Priestly, Corporal Detective Amy Franck, and Corporal Cindy Hardey at the Park County Sheriff's Office. We then all drove to Hartsel, where Sergeant B. Priestly waited for Teller County Animal Control Officer Cheri France. The rest of us went ahead to meet with two members from Park County Road and Bridge. While en route to the property, Sgt. B. Priestly stated to Park County Dispatch over the radio that she had tried to contact Samuel and Diane Walker to inform them of the search warrant, however their telephone just rings with no answer or voicemail.

We met with two men from the Road and Bridge Department with a large backhoe to dig through the frozen ground. As authorities approached the property, Corporal Detective Amy Franck posted the warrant on the entrance gate. We immediately noticed that the gate had been locked with a chain. Corporal Detective A. Franck picked the lock and everyone entered the facility.

As we approached the area known as the "pit" I noticed that there were no dogs in it. I asked Sergeant B. Priestly if Samuel had removed the deceased dogs, and she stated that she did not know, but it appeared the ground had been recently dug up. Corporal Hardey, Officer C. France and I began to dig up the ground. After a very short time, we all began finding deceased animals both inside and outside of dog food bags. The ground was frozen, however we were able to dig our four deceased dogs and one deceased cat from the shallow and recently dug grave. These dogs were identified as the same dogs seen on the last visit to the Walker Property, just thrown on top of the dirt in the pit. We photographed each animal both inside the pit and place in a white plastic bag outside of the pit. These photographs were identified with yellow placards listed from A to Z ending at AK. (see attached photographs).

Once we removed the dogs that we could with only shovels, we had the men from Road and Bridge begin digging with the backhoe. We uncovered several more dog food bags containing more deceased dogs that were farther along in the decomposition process. We dug approximately six feet deep, and continued to move up the ravine towards the fence line. As we continued we began finding only bones, skulls, femurs, and ribs. We also uncovered what appeared to be the skull of a goat or something like that. All of these findings were photographed and marked. (see Sergeant B. Priestly's report.) Once the entire ravine was dug, in total, we uncovered approximately thirty-five deceased dogs.

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| R. Bramlett 9531 [signature] | | Page ____ of ____ |

Rev. 6/98
N

Form: PCSO-



**PARK COUNTY SHERIFF'S OFFICE**

CONTINUA nON SHEET Case Report Number

**2009001744**

Initial Offense Classification Subject Date of Report

**U Cruelty to Animals Walker, Sam and Diane 01/07/10**

On December 16,2009 at approximately 9:00am I accompanied Deputy Gallegos, Sergeant Priestly, Corporal Hardey, and Park County Animal Control Officer Bramlett to an area off of Park County Road 53 and Forest Road 108. The complaint was regarding a report that they had received the previous day about a property that had approximately 100 neglected dogs on the property.

When we arrived on scene I observed numerous dogs chained to poles in front of their designated doghouses. As I glanced around at the dogs that were nearby most of them were very skinny and their ribs were visibly showing as well as their hipbones protruding. Many of them did not have a quality coat, the fur was hanging off of the dogs in clumps. I did not see any water in most of their water bowls and the dogs that did have water, the water was frozen into a block of ice and not drinkable.

Shortly after we arrived the group broke up into teams to number and tag each dog on the property. I worked with Sergeant Priestly and Corporal Hardey to number the dogs on the western half of the facility.

During our interactions with the dogs I did not experience any acts of aggression from the dogs that we tagged, and were either very friendly with us, or were very frightened and hid from us in or under their doghouses.

Some of the houses did not have straw in them to help them stay warm under the cold weather conditions. Each of the dogs were given a Park County dog tag with an assigned number as well as an assigned number written on their collars with a black Sharpie marker.

:-) After all the dogs were numbered and accounted for, I assisted Sergeant Priestly and Corporal Hardey in taking photographs of several dead dogs that were found at the back of the property in the "pit". There were three husky mixes that were covered in snow, and there was also a cat that was placed in an empty dog food bag.

One of the owners of the property spoke with Animal Control Officers while I took the pictures. She explained that the cat had gotten onto the facility and was killed by one of the dogs after it got into the doghouse with the dog. There was also a black dog that looked to be younger, curled up in another dog food bag deceased. The owner explained that the "puppy" had died from Giardia before she was able to get the dog treated. It was also explained to the owner that it was illegal to dispose of animals that had been euthanized without proper burial,

due to birds of prey having the potential consume the toxins in the euthanized animal.
There was a veterinarian also on scene with us that assisted with scoring each animal on their conditions
oftheir health. The dogs that were scored with "1 's" were removed to shelters to receive care that day. One of
the dogs that was mentioned during the previous day's investigation as their health being in question did not
survive through the night before we could get the dog care. Each dog was cleared with the officers on scene
before any were removed. After all the dogs that were in the gravest of conditions were removed, officers left
the scene and were going to return the following day to remove the rest of the dogs.
I returned with Animal Control Officers the following day to assist in the removal of the rest of the dogs
at approximately 9:30am. When we arrived on scene there was a middle-aged couple that was already there and
began loading up some of the dogs. They were advised that they needed to have approval from a Park County

} Officer's Signature & Number

10 Deputy A. Adam #9156

Rev. 6/98
N

Supervisor's Initials & Date Page __ of -- 0

Form: PCSOWalker, Samuel 09CR90 Walker, Diane 09CR91
Discovery 73
II

**PARK COUNTY SHERIFF'S OFFICE**

CONTINUATION SHEET Case Report Number

**2009001744**

**Initial** Offense Classification Subject Date of Report

**Cruelty to Animals Walker, Sam and Diane *01107/10***

Animal Control Officer before any ofthe dogs were removed, as they were property of the county. They were
cooperative with communicating with Animal Control as to which dogs were going with them.
Several other animal shelters showed up to assist with removing the dogs and taking them to receive care. All of the dogs were cleared and documented where they were going prior to removal. After all of the
dogs were kenneled and loaded up for removal, I assisted Corporal Hardey and Officer Bramlett in visually
inspecting each dog house individually to confirm that there were no dogs remaining on the property.

EXHIBIT C

**PARK COUNTY SHE[redacted]**
CONTINUATIO[redacted]

| Initial Offense Classification | Subject | [...]e Report Number 2009001744 / Date of Report |
|---|---|---|
| **Cruelty to Animal** | **Walker, Sam and Diane** | **12/15/09** |

Doctor Kate Anderson with the State Veterinarian Office began body scoring the remaining dogs. Approximately thirty percent of the dogs scored a (1) on the Henneke Body Condition Scoring System, which was bone structure easily noticeable, ribs protruding prominently, and spinous process projecting prominently. Approximately thirty dogs were removed from the property immediately. The dog that would not come out of the doghouse the day prior was found dead, the dog's description was a white female Husky that was still tethered to her chain lying outside her doghouse and had not eaten any of the dog food that was given to her by Whelan the day prior.

Sergeant Priestly, Deputy Adam and I walked up to the pit where the deceased dogs lay. Diane accompanied us. Sergeant Priestly and I removed approximately four dogs from the pit. There were three dogs' carcasses that were in the dog food bags. The dogs were identified as, two adult dogs and one younger dog. According to Diane the younger dog was a puppy. Diane stated, " Our puppies sometimes die". Sergeant Priestly asked Diane what the dogs' died from. Diane stated Veterinarian Jim Wright put most of the dogs down for several different reasons and Sam put the dogs in the pit to be buried. Sergeant Priestly asked Diane how many dogs were in the pit. Diane stated she wasn't sure, maybe eight.

Sergeant Priestly advised Diane that it was a Federal offense to put an animal down and leave the animal exposed for other animals to eat. If another animal ate the deceased dog then that animal could die. The reason for this is because the deceased animal has been injected with (Euthanasia B) which is used to put the animal down, and the drug remains in the carcass. Diane stated again that Sam put the dogs in the pit to be buried (refer to Sergeant Priestly report for those reasons).

Sergeant Priestly asked Diane which dogs where put down; Diane said she was not sure she couldn't tell. Sergeant Priestly and I took the dogs out of the dog food bags and Deputy Adam took pictures of the dogs (see attached CD).

Two of the dogs that were found dead on the Walker property, were an approximate five-year-old white female Husky (tethered), and a black and white female Husky mix approximately four years old (in a dog food bag.) (Veterinarian Dr. Kit Ryff identified the ages of the dogs in his report.) A volunteer, Sharon Morris, who is also the Park County Coroner, took the two huskies to Mountain Shadows Animal Hospital, in Salida, Colorado that day for Necropsy (animal autopsy). Veterinarian Dr. Kit Ryff and Dr. Annie Schultz, of Mountain Shadows completed the Necropsy's. The three skinny dogs belonging to the Walkers and taken to Debra Su's residence were transported to Mountain Shadows. The veterinarian reports and bills are filed (see attached documents).

| Officer's Signature & Number | Supervisor's Initials & Date | Page |
|---|---|---|
| Cpl. C. Hardey 9523 Cpl. C. Hardey 9523 | | Page ____ of 11___ |

Rev. 6/98 N

Form: PCSO-

EXHIBIT D

CVMA
Colorado Veterinary Medical Association
Find a Veterinarian
Lost Pet?
Resources for Pet Owners
Animal Events
FAQs
About CVMA
Advocacy/Outreach
Careers/Classifieds
Contact CVMA
Issues
Meetings/Education
Member Resources
Membership
Partners
Press Room
Programs
Publications
Search

## Issues

### Animal Disposal

**Protect Yourself From Accidental Wildlife Deaths -** CVMA *Voice* Winter 2002

A recent article and letter to the editor in AVMA's Journal of the American Veterinary Medical Association (JAVMA) highlighted the environmental perils that can occur when animals euthanized with drugs such as sodium pentobarbital and wildlife mix – always with tragic results.

Case in point: In 1999, a Colorado veterinarian and a rancher inadvertently poisoned five golden eagles and two bald eagles after the birds of prey fed on two mule carcasses that had been euthanized with sodium pentobarbital. Horrified by what had happened but wanting to meet their ethical responsibilities, the individuals contacted authorities. They were fined $10,000 each for violating the Migratory Bird Treaty Act, the Eagle Protection Act, and the Endangered Species Act. It could have been worse. The penalties for such a violation can go as high as $100,000 for an individual or result in one year in prison for a misdemeanor conviction. Subsequent violations can be charged as a felony.

Birds aren't the only victims of accidental sodium pentobarbital poisoning. A bear and two cubs were killed after digging up the carcass of a euthanized animal that was buried 10 feet underground. And the problem isn't just one for large animal veterinarians; euthanized domestic animals in landfills have been implicated in wildlife deaths as well.

What can you do to protect yourself, Colorado's magnificent wildlife, and still meet your obligations and responsibilities as a veterinarian? The following guidelines can help.

How should an animal that has been euthanized with sodium pentobarbital be properly disposed of?
Any time a veterinarian uses a barbiturate to euthanize an animal, that body must be disposed of as quickly as possible. Colorado state law does not stipulate a timeframe, but does specify that a body must be at least two feet underground. In areas where ground water is an issue, that body may need to go to a landfill. The law also indicates that no dead animal or part of a carcass be placed within one mile of a residence.

Local regulations may vary and you should contact your county's public health department for details. For a list of Colorado counties online, visit www.state.co.us/gov_dir/countygovs.html. For a list of Colorado cities and towns online, visit www.state.co.us/communities_dir/municipalgovs.html.

Whose responsibility is it to dispose of an animal that has been euthanized?
The animal owner is the responsible party. However, if the owner does not dispose of the body in a proper or timely manner, the responsibility may fall back on the veterinarian.

How can I protect myself?
Make sure your client knows how to properly dispose of a carcass. If the animal is being buried, make sure that a backhoe is on site to do the job. You may even insist that a hole be dug while you are there. At the very least, make sure that the body is securely covered by plastic before you leave the premises.

Although not proven in court, another step you can take that should protect you legally is to have your client sign a euthanasia form that puts the onus of proper disposal of the owner and outlines what entails a proper disposal. You can create this form on your own or with a lawyer. The Raptor Education Foundation has created a National Euthanasia Registry (NER) that will provide veterinarians with a three-part form. One copy is given to the client, one stays with the veterinarian, and one goes to the NER office. There is a fee for this service. For more information, visit www.usaref.org.

How can I educate my clients about proper disposal?
Education is key. Provide clients with a list of their responsibilities and what entails a proper disposal of a euthanized animal. Include names and phone numbers of landfills that will accept carcasses, crematoriums, and other companies that deal with animal carcass removal and disposal. This type of information is especially helpful for clients who have large animals as a hobby or for companionship and may not have disposed of a large carcass before. If possible, give this list to the client prior to your visit so they are prepared.

*Many thanks to Dr. Wayne Cunningham for his contribution to this article.*

Colorado Veterinary Medical Association
191 Yuma Street  Denver, CO  80223
phone 303.318.0447  |  fax 303.318.0450  |  e-mail info@colovma.org

Privacy Policy

Copyright © 1999-2009  Colorado Veterinary Medical Association  all rights reserved



Nov 15, 2012

To whom it may concern:

Bobby Priestly worked in my Veterinary practice, the Animal Care Clinic, several years ago, for some time, probably 2003 and 2004. She helped in all areas of the practice, and was familiar with our policies which was helpful as she also worked for Animal control.

Eventually her main duties became paperwork. I was always informed my clients that any animal which were euthanized that the animal had to be buried or cremated, and the body should be under at least 2 feet underground, and not near a waterway.

Sincerely,

James P Wright, DVM

James P Wright, DVM

Exhibit F

**AFFIDAVIT OF NANCY MAE SEASE**

1. I am over eighteen years of age and have personal knowledge of the matters stated herin.
2. I personally photographed the animal graveyard located at 6000 FS 108, in Park County, CO and had the photos developed at Walgreens in Colorado Springs, CO.
3. I personally observed animal remains (bones) strewn over the surface of the graveyard and at least two plastic bags were partially exposed to the environment at the surface.
4. I personally observed a very thick blue bag torn open and with what appeared to be numerous bite marks on the plastic by local wildlife.

Nancy Mae Sease
Nancy Mae Sease

Subscribed and sworn to before me on 11·16, 2012.

Notary Public: Amy R Ruebesam

My commission expires: 9·26·14

AMY R. RUEBESAM NOTARY PUBLIC STATE OF COLORADO My Commission Expires 9/26/2014



**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**OFFICE OF THE CLERK**

GREGORY C. LANGHAM
CLERK OF COURT

Room A-105
Alfred A. Arraj United States
Courthouse
901 19th Street
Denver, Colorado 80294
Phone(303) 844-3433
www.cod.uscourts.gov

This is the best quality copy of the following document.

Clerks Office
United States District Court

EX
F-1

EX
F-2

EX
F-3





EXHIBIT G

| | |
|---|---|
| DS | Let me, let me clarify that. A lot of people are having issues with how he disposed of them. It is winter, I don't have an issue with that at all. |
| SO | Right. Well and I don't have an issue that either, but I.... |
| DS | If you go down farther, I'm pretty sure you'll find more. |
| SO | Okay. |
| SO2 | Up that ravine, further? |
| DS | No, right in that... |
| SO | Just right where they're at, just down...? |
| DS | Well last year's dog, dog, both dogs that he had lost, or, previous, previous to last year were up farther, so those are like way dead and gone for a long time, and buried over with dirt. |
| SO | Okay. |
| DS | But last year, I don't know of any dogs he lost, cause we were up there helping him and training with him and running dogs, and we'd go up there every, every couple weeks. |
| SO | Would you venture to guess how many dogs are in that pit? |
| DS | Well as Orion and Mark's math goes, they figure he loses between 20 and 30 year. |
| SO | Okay, so. |
| DS | Times 5. You tell me. |
| SO | So he loses, according to their math, and you guys would know, I mean, that's kind of, cause we were talking about, he also has like what, 25 to 30 puppies a year? |
| DS | That's what, that's what Orion says independently of Mark, and we were going, and I hadn't even thought of it, you know but, I didn't see any up there last year. |
| SO | Okay. |
| DS | At all. I didn't see any in there. And I go check. |
| SO | Okay. |
| DS | I know which dogs are who, more than, obviously more than his wife does. |
| SO | Okay, okay. Now can you tell me about Angel? I have the vet aging Angel at 5. |
| DS | I don't know her. |
| SO | She's the white one that died, that night. |
| DS | Really? Now I don't, that's a Cartwright dog also. |
| SO | Who's Cartwright? |